Mabel THOMPSON et al., Plaintiffs,

v.

James F. WALSH et al., Defendants.

No. 75 CV 494–W–B–1.

United States District Court,
W. D. Missouri, W. D.

Dec. 19, 1979.

---

6. *See* discussion in Wright, *Federal Courts,* § 53 (3d ed. 1976).

James S. Bolan, Legal Aid Society of Kansas City, Kansas City, Mo., Stuart R. Berkowitz, Legal Services of Eastern Missouri, Inc., St. Louis, Mo., for plaintiffs.

Robert R. Northcutt, Paul T. Keller, Dept. of Social Services, Jefferson City, Mo., for defendants.

## MEMORANDUM AND ORDERS GRANTING PLAINTIFFS' MOTIONS FOR CIVIL CONTEMPT

JOHN W. OLIVER, Chief Judge.

### I.

On November 24, 1976, the Honorable William H. Becker, then Chief Judge of this Court, entered a preliminary injunction which required that defendants process applications for Aid to Families with Dependent Children (AFDC) within 45 days as required by 45 C.F.R. § 206.10(a)(iii). That order provided in part that:

> [D]efendants be, and they are hereby enjoined and restrained from failing to obtain substantial compliance with the Forty-Five day time limit for processing applications for benefits under the Aid to Families with Dependent Children Program pending a determination of the merits.

This case now pends on two motions filed by plaintiffs for civil contempt, both of which allege that defendants are not in substantial compliance with the applicable 45 day time limit for processing AFDC applications, as required by applicable federal law and this Court's November 24, 1976 order.

The first motion was filed March 3, 1978 before this case was transferred to Division I of this Court on July 12, 1979. The second motion was filed September 24, 1979, subsequent to that transfer.

Appropriate pretrial proceedings were conducted which resulted in the execution of a stipulation under which the parties agreed in paragraph 13 thereof that:

> The Stipulations contained in this document are full and complete for purposes of the pending motions for civil contempt. The parties expressly waive their right to offer any further evidence, by hearing or otherwise, in connection with the subject motions. The motions may be taken as submitted upon the filing of this document and the parties expressly waive any objection they may have to the resolution of these motions at this time. The par-

ties, however, reserve their evidentiary objections to the relevance and materiality of the facts contained in these Stipulations.

The Court has considered the stipulated facts and the briefs filed by the parties. We find and conclude that plaintiffs' motions must be granted for reasons we now state.

## II.

It is stipulated that Appendices A and B attached to the stipulation are true and accurate summaries of information contained in computer printouts which have been produced on a monthly basis pursuant to an order entered on February 5, 1977. Appendix A reflects the percentage of approved applications pending longer than 45 days with respect to each month since November, 1976 until August, 1979, the last month covered by the stipulation. Appendix B reflects, on the same monthly basis, the number of approved and rejected applications which took longer than 45 days to process. Both Appendices A and B include various percentage figures.

The parties further stipulated in paragraphs 7 to 11, inclusive, the following factual data:

7. During the 1979 session of the 80th General Assembly, the Missouri legislature passed an appropriations bill known as House Bill No. 9, which appropriated funds for the operation of the Department of Social Services.

8. Section 9.420 of H.B. 9 contained an appropriation for 2,056.95 full-time equivalent (F.T.E.) staff positions within the Income Maintenance Administration of the Division of Family Services for fiscal year 1980. In fiscal year 1979 the Division of Family Services operated with 2,056.95 F.T.E. within the Income Maintenance Administration.

9. The Income Maintenance Administration is responsible for, among other things, the processing of AFDC applications.

10. On June 29, 1979 in his veto message to the legislature, Governor Joseph P. Teasdale vetoed 133.5 staff positions from Section 9.420 of H.B. 9.

11. The Division of Family Services, as a result of the Governor's veto message, immediately imposed a hiring freeze within the Income Maintenance Administration and since that time has reduced the number of staff positions by 133.5 through attrition, transfer, and lay-off.

It is undisputed that in June, 1979, the month in which the Governor vetoed 133.5 staff positions from the appropriation bill passed during the 1979 session of the 80th Missouri General Assembly, 661 of 3,128 applications were not processed within the 45 day time period. 588 of those applications were eventually approved after the expiration of the 45 day time period. Only 73 were rejected.

Appendix B reflects that in the month of July, 1979, 3,606 applications were processed. 487 were not processed within the 45 day period; 403 were eventually approved and 84 were rejected. Appendix B reflects that of 4,499 applications for the month of August, 1979, 575 were processed after the expiration of the 45 day period. 391 were eventually approved; 184 were eventually rejected.

Appendix A reflects the percentage of approved applications which were in fact processed within the 45 day time period. Those percentages, in table form, are as follows for the months of June, July, and August, 1979:

| Month | Statewide (Except St. Louis City) | St. Louis County | Jackson County |
|---|---|---|---|
| June, 1979 | 68.1% | 46.6% | 45.6% |
| July, 1979 | 82.0% | 78.4% | 48.0% |
| August, 1979 | 83.1% | 63.5% | 39.5% |

Appendix A also shows that defendants approved more than 90% of the Statewide (except St. Louis City) applications within the 45 day period in only 16 of 31 months from November, 1976 to May, 1979. More than 90% of the St. Louis County applications were processed within 45 days in only 3 of those 31 months. And in only 9 of those 31 months were more than 90% of the Jackson County applications approved with-

in the 45 day period. Appendix B shows that the total number of applications each month during the period from November, 1976 to May, 1979 ranged from 2,088 to 3,601. That appendix also shows that there were 3,128 applications in June, 1979; 3,606 applications in July, 1979; and 4,499 applications in August, 1979. It is not unreasonable to assume that the ravages of inflation, which strikes the poor more harshly than any other segment of our society, will cause the number of applications to continue to rise.

Appendix D attached to the stipulation is a letter from Governor Teasdale to Director Freeman of the Missouri Department of Social Services, dated October 23, 1979. That letter establishes that for at least "several weeks" before October 23, 1979, the "work load problems of the Division of Family Services" required the personal attention of the Governor, members of the General Assembly, members of the staff of the Department of Social Services, and the Missouri Office of Administration. The Governor's October 23, 1979 letter reads as follows:

October 23, 1979

Mr. Dave Freeman, Director
Department of Social Services
Broadway Building
Jefferson City, Missouri 65102

Dear Dave:

As you know, in the past several weeks I have been meeting with legislators, members of your staff and Office of Administration, to gain a clear picture of the workload problems of the Division of Family Services offices. As a result of these meetings, I am taking the following actions:

1. I am authorizing payment of overtime to employees of Jackson County, St. Louis, and St. Louis County to help reduce the backlog of applications. If necessary I will recommend supplemental appropriations to cover such expenditure.

2. I am authorizing the hiring of *temporary* employees in those jurisdictions for up to 90 days to reduce the backlog.

3. I am asking you to assist the Commissioner of Administration in a re-examination of the ten to twelve days time-lag required to process welfare checks and asking you both to take other administrative steps necessary to reduce that time.

4. I am asking the Commissioner of Administration to lend support from the Division of EDP Coordination to speed up the automation of case processing with the hope that we can accomplish automation at a much earlier date.

5. I plan to review the staffing pattern and workload of Division of Family Service employees as part of the supplemental package we will prepare in early December.

I hope you will communicate these actions to the appropriate staff members in your department.

Sincerely,

Governor

The stipulated data establishes that hundreds of families who were eligible for AFDC benefits are being deprived of those benefits each month because of defendants' failure to comply with applicable federal law and this Court's November 24, 1976 order. When then Chief Judge Becker entered the November 24, 1976 order he stated that "most welfare applicants lack independent resources to obtain essential food, clothing, housing and medical care while their application is pending." In reliance upon the Supreme Court's opinion in *Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), then Chief Judge Becker concluded that "the delay in processing applications thus renders the applicants' situation 'immediately desperate.'" This Court reiterates and expressly adopts the conclusions stated over three years ago by then Chief Judge Becker.

III.

This case is not the first case in which the question of the State of Missouri's administration of the federal AFDC program has been presented to a federal court. In 1970, the State of Missouri successfully contended in the United States District Court for the

Eastern District of Missouri, see *Like v. Carter*, 318 F. Supp. 910 (E.D.Mo.1970), that questions relating to the performance of the State of Missouri in administering the AFDC program could not be presented in a class action case and that if the enabling statutes passed by the Missouri General Assembly and the administrative regulations promulgated by the State of Missouri were, on their face, consistent with the federal statutes and with applicable federal administrative regulations, "the federal requirements do not control because they require only the state plan to be consistent with the federal requirements." *Id.* at 914.

The Court of Appeals for the Eighth Circuit, however, reversed the district court's adoption of the State of Missouri's argument in *Like v. Carter*, 448 F.2d 798 (8th Cir. 1971). The Court of Appeals concluded that the district court had "abused its discretion in refusing to permit the action to proceed as a class action." *Id.* at 802. On the merits, the Court of Appeals held that:

> The federal government makes substantial contributions to the states for use in carrying out the welfare program here involved. Conformity with the applicable federal rules and regulations is a prerequisite to eligibility for such aid. The state has failed to follow the required federal standards set forth in the federal statutes and regulations for the prompt processing of welfare applications.
>
> \* \* \* \* \* \*
>
> The judgment dismissing the complaint is reversed. The case is remanded to the trial court for further proceedings consistent with the views herein expressed. [448 F.2d at 805]

In footnote 1 on page 804 of 448 F.2d, the Court of Appeals made reference to the fact that on May 3, 1971 an HEW hearing examiner held a hearing and prepared a report which recommended a determination that "the Missouri time standard for determining eligibility for financial assistance for welfare applicants is not in conformity with federal laws, rules and regulations." The Court of Appeals commented in that footnote that the HEW hearing examiner's recommendation had not become final at the time of the Court of Appeals' decision and that the court accordingly "placed no reliance upon such determination in reaching our decision."

The Court of Appeals, however, in the text of a latter part of its opinion expressed the "[hope that] the HEW's pending investigation mentioned in footnote 1 may aid in bringing about conformity with the federal laws and regulations."

The record in this case does not show why effective relief was not obtained in the *Like v. Carter* litigation after remand to the Eastern District of Missouri. Nor does the record in this case show why the hope expressed by the Court of Appeals in that litigation in regard to the 1971 HEW investigation was not realized. The record in this case does show that the pending case was filed in this Court four years after the Court of Appeals reversed and remanded *Like v. Carter* and that this Court entered its preliminary injunction on November 24, 1976.

The data presented by plaintiffs in support of their first motion for contempt of this Court's November 24, 1976 order accurately states that then Chief Judge Becker entered an order on February 5, 1977, which required defendants to prepare and produce computer printouts which would reflect their compliance with the November 24, 1976 order. The data plaintiffs presented in support of their first motion established that the implicit hope that defendants' performance would be improved by this Court's February 5, 1977 order was not realized. The data presented by the plaintiffs in support of their first motion established that in the year following the November 24, 1976 order approximately 2,767 eligible families did not have their AFDC checks mailed within the 45 day period. As stated above, the stipulated data presented in support of plaintiffs' second motion covered defendants' performance from the date the order was entered through the month of August, 1979. From December, 1977 to August 1979, a total of 4,097 applications which were eventually approved were not proc-

essed within the 45 day period; an average monthly default of over 140 applications per month.

## IV.

Plaintiffs' position in regard to remedy, presented in their suggestions in support of their first motion and reiterated in their suggestions in support of their second motion, directs this Court's attention to at least two remedies which other courts have followed to obtain compliance with applicable federal law and federal regulations. The first remedy invokes the principle of "presumptive eligibility," as illustrated and applied in cases such as *Class v. Norton*, 376 F.Supp. 496 (D.Conn.1972). Data collected in Appendix B suggests that the cost of applying the "presumptive eligibility" remedy would be comparatively small in light of the relatively few numbers of applications which are actually rejected after the expiration of the mandatory 45 day time limit.

A second remedy suggested by plaintiffs was approved by the Seventh Circuit in *Rodriguez v. Swank*, 496 F.2d 1110 (7th Cir. 1974). That case affirmed an order of the district court which provided that after a three month period of grace, in any case in which an application (through no fault of the applicant) pended longer than the time period established by federal regulations, and subsequently was approved, the applicant would be entitled to $100 compensatory damages in addition to the regular benefits for which the applicant was eligible. In affirming that order, the Seventh Circuit gave appropriate consideration to the then recent opinion of the Supreme Court in *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct.

1347, 39 L.Ed.2d 662 (1974),[1] which held that a district court must design its remedial orders to apply prospectively rather than retroactively. We turn now to defendants' suggestions in opposition to plaintiffs' motions.

## V.

Defendants commendably recognized their "obligation under federal regulations" in their response to plaintiffs' first motion. And defendants there recognized "that there is room for improvement." Defendants, however, argued that plaintiffs failed to "establish a lack of substantial compliance with this Court's November 24, 1976 order." Defendants suggest that this Court, in determining whether defendants are in fact in substantial compliance, should consider the factual data presented "in terms not only of forty-five days but also in terms of fifty days." Defendants' response to plaintiffs' second motion concedes, contrary to the position which defendants attempted to maintain in the *Like v. Carter* litigation, that "the time limits contained in 45 C.F.R. § 206.10(a)(iii) prescribe a forty-five (45) day time limit for action on applications from the date of the application." But defendants reiterated the argument that "this Court should look at the length of delays beyond the time limit" in determining whether defendants are in substantial compliance with this Court's November 24, 1976 order. Defendants contend that "if substantial compliance is looked at in terms of fifty (50) days, . . . [such] substantial compliance is achieved by defendants' ability to process applications in fifty (50) days instead of forty-five (45) days."

1. *Edelman*, in addition to deciding other questions, disposed of the State of Illinois' attack upon the validity of the time limitations established by federal regulation in footnote 8 on pages 659–60 of 415 U.S., page 1370 of 94 S.Ct. Mr. Justice Marshall in his dissenting opinion appropriately noted that the majority opinion in that case deemed the State of Illinois' attack upon the validity of the federal time limitation as "unworthy of discussion" and pointed out that absent the imposition of an appropriate remedy to obtain compliance with such a regulation, "state welfare officials have everything to gain and nothing to lose by failing to comply with the Congressional mandate that assistance be paid with reasonable promptness to all eligible individuals." Mr. Justice Marshall expressly adopted the conclusion of the 7th Circuit that without an appropriate remedy a court would indeed be faced with "the spectre of a state, perhaps calculatingly, defying the federal law and thereby depriving welfare recipients of the financial assistance Congress thought it was giving them."

Defendants further argue that they "took the unusual step of requesting and receiving authorization from the Honorable Joseph P. Teasdale, Governor of the State of Missouri, to take extraordinary remedies [which] included the authorization and use of one thousand, five hundred fourteen (1,514) hours of overtime to reduce the backlog of pending applications."

It is difficult to understand why the step taken by defendants to remedy the defaults established by the stipulated data can properly be described as "an unusual" step under the undisputed circumstances of this case. Nor can this Court understand how the authorization and use of overtime may be properly described as an "extraordinary measure" in light of the stipulated fact relating to the 133.5 reduction of staff positions assigned the Income Maintenance Administration. Paragraph 3 of the Governor's October 23, 1979 letter suggests that a "ten to twelve days time lag . . . to process welfare checks" was recognized as an existing fact at the meetings referred to in that letter.

Defendants in their attempt to support their argument that a 50 rather than a 45 day time limitation should be applied, quote language contained in the Third Circuit opinion of *Shands v. Tull*, 602 F.2d 1156 (3rd Cir. 1979). That case, unlike the procedural situation presented in this case, involved a direct appeal from an order of the district court rather than a motion for contempt. The factual circumstances presented in *Shands* involved only a handful of administrative appeals which had not been decided within the 90 day limit provided by federal regulations. While *Shands* is clearly distinguishable under the procedural circumstances presented and on its facts, it is appropriate to note that the Third Circuit cited and relied upon the Eighth Circuit opinion in *Like v. Carter, supra*, to support its conclusion that "the federal regulation is mandatory." *Shands* does not support defendants' argument because that case did

no more than hold that under the factual circumstances there presented the district court should have determined that New Jersey was in substantial compliance with the federal regulations.[2]

We find and conclude under all of the undisputed factual circumstances established by the files and records of this Court, and particularly under the facts as stipulated by the parties in connection with the pending motions for contempt, that plaintiffs have established beyond reasonable doubt that defendants are not in substantial compliance with this Court's order of November 24, 1976. We further find and conclude that the data relating to defendants' 50, rather than 45 day argument, as presented in Appendix C attached to the stipulation, does not support a contrary finding and conclusion.

This Court is therefore under duty to consider the two remedies suggested by plaintiffs together with any other available remedies under which defendants may be brought into compliance with this Court's order of November 24, 1976. We turn to that difficult question in the next part of this memorandum opinion.

## VI.

A close reading of the Seventh Circuit's opinion in *Rodriguez v. Swank, supra*, establishes that the distinguished panel of that court, composed of the late Mr. Justice Clark (Retired) and Circuit Judges Cummings and Pell, considered both the compensatory damage remedy and the presumptive eligibility remedy suggested by plaintiffs in this case. The district court's determination that the compensatory damage remedy should be adopted in that case was affirmed as was, on plaintiffs' cross-appeal, the district court's refusal to adopt the presumptive eligibility remedy. *Rodriguez v. Swank* also approved the district court's determination that the remedy of "complete

---

**2.** The Third Circuit appropriately noted that in 5 of the 17 cases actually involved "the State had continued to pay undiminished benefits during the appeals so that there was no hard-

ship to those particular [plaintiffs]." [*Id.* at 1158]. No like factual circumstance is presented in this case.

forfeiture of federal funds would be too harsh a remedy to impose upon the state." [3]

It is therefore apparent that the district court in *Rodriguez v. Swank* considered at least three, rather than two, remedies before reaching its conclusion that the compensatory damage remedy was appropriate under the circumstances of that case. Indeed, we suspect that Judge Decker actually considered, but did not discuss, many more than three possible remedies before he rendered final decision in that case. For experience teaches that most judges recognize that the judicial task of determining whether a particular State is in compliance with applicable federal welfare law is an infinitely easier judicial task than designing and selecting an appropriate remedy which will assist and enable a State to cure its default and to administer the welfare program in accordance with applicable federal law.

In the determination of an appropriate remedy, as the court stated in *Rodriguez v. Swank*, a federal court of equity is not limited to "one inflexible remedy," *Id.* at 1113. Such a conclusion is consistent with the Supreme Court's oft-cited opinion in *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944), which held that "the historic injunctive process was designed to deter, not to punish," and that "the essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it."

The Supreme Court commented in *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), that "while we view with concern the escalating involvement of federal courts in this highly complicated area of welfare benefits, . . . we find not the slightest indication that Congress meant to deprive federal courts of their traditional jurisdiction to hear and decide federal questions in this field." That case

suggested, however, that in this highly complicated area of welfare law, a federal court of equity need not "deprive itself of the benefit of the expertise of the federal agency that is primarily concerned with these problems."

*Rosado v. Wyman* noted with approval that "the District Court, in this instance, made considerable effort to learn the views of HEW" and explored "the possibility of HEW's participation, either as a party or an *amicus*," in that case. We have heretofore noted that the Court of Appeals expressed the hope in *Like v. Carter* that the then pending HEW investigation might bring the State of Missouri into conformity with applicable federal laws and regulations.

We are convinced that appropriate consideration must be given to the possibility that the national experience and the expertise. of what is now the Department of Health and Welfare, formerly, the Department of Health, Education and Welfare, may be of assistance to the Court and counsel in designing an appropriate and practical remedy which will assist the defendants in curing their default and which may aid them in designing innovative procedures which will permit full compliance with all applicable federal law and all applicable federal regulations in their future administration of the AFDC program in this State.

In accordance with this Court's established practice of not inviting participation of a federal agency either as a party or as an *amicus* in a particular pending case without obtaining the views of the parties in such a case, an appropriate order will be entered seeking the views of counsel and directing that a copy of this opinion be forwarded to the Honorable Patricia Harris, Secretary of the Department of Health and Welfare, for her information and for whatever comment she or the Department may believe would be helpful to counsel for the parties under the circumstances.

**3.** The court added: "Of course, if defendants prefer that remedy, they may at any time voluntarily forfeit federal funds and relieve themselves of any obligation to comply with federal regulations." There is no evidence in this case to support the notion that the State of Missouri wishes to voluntarily forfeit federal funds. Plaintiffs, for obvious reasons, have not suggested that this Court consider that drastic remedy.

Accordingly, it is

ORDERED (1) that plaintiffs' motions for civil contempt should be and are hereby granted. It is further

ORDERED (2) that on or before January 14, 1980, counsel shall convene an across-the-table conference to determine whether this Court should seek the views of the Secretary of the Department of Health and Welfare as either a party or as an *amicus* to assist it in designing an appropriate remedy consistent with the order granting plaintiffs' motions for contempt. It is further

ORDERED (3) that the Clerk shall forward a copy of this opinion to the Honorable Patricia Harris, Secretary of the Department of Health and Welfare, in order that she may communicate any views which that Department may have to counsel for their consideration. It is further

ORDERED (4) that the Court will give appropriate consideration to a request by counsel to extend the January 14, 1980 deadline should such extension be sought before that date.