Jane FORTIN, et al., etc., Plaintiffs,
Appellees,

v.

COMMISSIONER OF the MASSACHU-
SETTS DEPARTMENT OF PUBLIC
WELFARE, Defendant, Appellant.

No. 82–1138.

United States Court of Appeals,
First Circuit.

Argued Sept. 10, 1982.

Decided Nov. 4, 1982.

H. Reed Witherby, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Paul W. Johnson, Asst. Atty. Gen., Boston, Mass., were on brief, for appellant.

Jim Hammerschmith, Northampton, Mass., for appellees.

, Before SWYGERT,* Senior Circuit Judge and BOWNES and BREYER, Circuit Judges.

SWYGERT, Senior Circuit Judge.

This case is an appeal from an order of the district court finding the Massachusetts Department of Public Welfare ("Department") not in substantial compliance with a 1975 consent decree enjoining delays in welfare eligibility determinations, holding the Department in civil contempt, and imposing fines for further noncompliance. The Department also appeals the district court's denial of its motion to amend the decree. Because the finding of substantial noncompliance is not clearly erroneous, and the penalty does not violate the eleventh amendment to the Constitution, we affirm the contempt order. We also affirm the denial of the motion to amend, because it was not an abuse of the district court's discretion.

I

In 1974 the plaintiffs filed this class action alleging that the Department failed to comply with federal and state law and regulations in administering the cooperative Aid to Families with Dependent Children ("AFDC") program and the state-run General Relief ("GR") program. Each program

* Of the Seventh Circuit, sitting by designation.

prescribes a time limit following application in which eligibility determinations must be made. In early 1975 the Department met the thirty-day AFDC limit [1] in 66.8% of the cases, and the two-week GR limit [2] in 52.5% of the cases. On March 3, 1975, the district court approved the consent decree, in which the Department agreed to process AFDC applications and mail checks to those eligible within thirty days, to determine GR eligibility within fourteen days of application, and to mail GR checks within eight days of the eligibility determinations.

In September 1978 the plaintiffs filed a motion to hold the Department in civil contempt for failure to comply with the decree. At that time, according to the Department's own statistics, the average rate of timeliness in the Commonwealth's six regions was 79% for AFDC and 87% for GR. After extensive hearings, during which the court found substantial noncompliance, the district court held the Department in civil contempt on December 2, 1981. The Department's statistics for July 1981, the last month's available at the time of the contempt order, showed statewide average compliance of 94.4% for AFDC and 94.1% for GR, with compliance rates as low as 87.3% for AFDC and 87.5% for GR in individual regions. Both before and after July 1981 the rates fluctuated from month to month. In its contempt order the district court noted that "compliance was often below 90% and sometimes below 80% for a particular region and month,[3] that the statistics for the period in question had overstated compliance because of the Department's practices of postdating some applications and denying others that were incomplete after a certain time period even when the applicant was not at fault, and that the decree was neither ambiguous nor impossi-

---

1. The Social Security Act requires that "aid . . . be furnished with reasonable promptness." 42 U.S.C. § 602(a)(10) (1976 & Supp. IV 1980). Federal regulations further define what period is reasonable, specifying that states must prescribe limits for eligibility determinations of not more than forty-five days from the date of application. 45 C.F.R. § 206.10(a)(3)(i) (1981).

Massachusetts has adopted a standard of thirty days. Mass.Gen.Laws Ann. ch. 18, § 16 (West 1981); Mass.Admin.Code tit. 106, § 302.230 (1978).

2. Mass.Gen.Laws Ann. ch. 17, § 5 (West 1982).

3. The court relied on the following statistics:

| | STATEWIDE AVE. COMPLIANCE | | LOWEST REGIONAL COMPLIANCE | |
|---|---|---|---|---|
| | AFDC | GR | AFDC | GR |
| October 1979 | 89.0 | 82.0 | 79.0 | 70.0 |
| November | 93.0 | 90.0 | 82.0 | 82.0 |
| December | 94.1 | 93.3 | 83.6 | 82.1 |
| January 1980 | 94.3 | 88.7 | 90.8 | 79.5 |
| February | 97.2 | 93.8 | 95.7 | 89.1 |
| March | 96.9 | 94.1 | 96.4 | 87.3 |
| April | 97.1 | 94.1 | 94.5 | 89.5 * |
| May | 97.7 | 96.6 | 96.1 | 94.6 * |
| June | 96.8 | 96.6 | 94.3 | 93.5 |
| July | 95.7 | 93.7 | 90.4 | 88.6 |
| August | 91.2 | 89.6 | 87.8 | 86.8 * |
| September | 89.8 | 86.8 | 82.3 | 79.6 |
| October | 92.4 | 89.5 | 85.2 | 79.8 |
| November | 91.8 | 89.9 | 82.5 | 75.3 |
| December | 91.3 | 87.3 | 78.0 | 78.5 |
| January 1981 | 91.2 | 89.0 | 77.1 | 78.5 |
| February | 95.8 | 94.9 | 92.5 | 89.4 |
| March | 96.9 | 96.1 | 95.7 | 92.7 * |
| April | 95.7 | 95.7 | 91.0 | 89.2 |
| May | 97.8 | 96.9 | 95.3 | 91.1 |
| June | 97.1 | 97.4 | 94.7 | 92.3 |
| July | 94.4 | 94.1 | 87.3 | 87.5 |

* Indicates that compliance percentages for AFDC and GR are from different regions.

bly strict. It therefore ordered the Department to pay a $100.00 fine to each eligible applicant whose eligibility determination is delayed up to thirty days, and an additional $100.00 fine for every sixty-day period of delay thereafter.

## II

The Department argues on appeal that the findings of substantial noncompliance and contempt were legally incorrect because the compliance statistics met the legal standard of substantiality, and its diligence and improvement in compliance precluded contempt. We address these two contentions in turn.

### A

 In this circuit district court findings based on undisputed facts or documentary evidence are reviewable only for clear error, the standard prescribed by Fed.R. Civ.P. 52(a) for all factual findings. *See, e.g., Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 377 (1st Cir.1980); *Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573, 576 & n. 2 (1st Cir.1980); *Raymond v. Eli Lilly & Co.,* 556 F.2d 628, 629 (1st Cir.1977). This is true even when a mixed question of law and fact is at issue, as here. *See Sweeney v. Board of Trustees,* 604 F.2d 106, 109 n. 2 (1st Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980). *See also Pullman-Standard v. Swint,* —— U.S. ——, 102 S.Ct. 1781, 1790 n. 19, 72 L.Ed.2d 66 (1982). This standard is met only "when although there is evidence to support [the finding], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has

been committed." *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). The finding of substantial noncompliance has not been shown to be clearly erroneous.

 The Department argues that its noncompliance rate for the last six months preceding the contempt order in which statistics were available averaged 96.3% for AFDC and 95.8% for GR, rates comparable to that found to satisfy a different timeliness regulation in *Shands v. Tull,* 602 F.2d 1156, 1161 (3d Cir.1979). This argument is flawed for several reasons, however. First, the district court properly looked to a larger band of statistics than the six months' the Department highlights. Although it is true that contempt is a penalty reserved for present and not past wrongs, the court's broader perspective was justified because of the history of seasonal fluctuations in the compliance levels. In fact the compliance rates dipped in the months following the six-month period ending in July 1981.[4] The levels of compliance during the period the court considered were poorer than the levels during those six months.

Second, the district court did not rely on the statewide averages alone in assessing substantiality of compliance, but looked to regional rates as well. Even during the six-month period to which the Department refers, regional compliance rates were as low as 87.3%, and some regional rates were worse in the periods before and after. These blemishes on the record of compliance tend to refute the Department's claim of substantiality.

**4.** The statistics originally submitted by the Department showed AFDC and GR combined statewide average rates of 95.0% (August 1981); 91.7% (September); 90.7% (October); 86.3% (November); 91.6% (December). In January 1982 the statewide average rates were 89.0% (AFDC) and 90.4% (GR). These statistics had been adjusted to exclude cases of delay caused by applicants. At oral argument, counsel for the Department revealed that these figures as well as the others previously submitted overstated compliance because of a computer programming error. The revised combined AFDC and GR statistics for these months

showed compliance rates of 93.1% (August); 90.8% (September); 89.7% (October); 86.0% (November); 88.3% (December); 89.9% (January). The Department argues in the report containing these revised statistics that the rates were depressed for five months during transition to a new computer system during the fall of 1981. The district court, of course, did not rely on these rates in finding substantial noncompliance; the point here is merely that the vicissitudes to which the rates are subject in general justified the court's consideration of a larger sample of compliance figures than the Department urges.

Third, the district court found that the available statistics overstated compliance to a degree, because some of the Department's employees postdated applications or denied applications that could not be processed within the proper time for reasons beyond the applicants' control, in violation of 45 C.F.R. § 206.10(a)(3) (1981). It is no answer that this problem has been remedied, for, as the district court noted, the assurance of remedial action came after the statistical period on which the Department relies. Those figures therefore remain suspect. Moreover, even if the Department is correct in its additional assertion that the statistics understate compliance in some other respects and that the errors tend to offset each other, the Department revealed at oral argument that the statistics considered by the district court contained a hitherto unknown error that inflated the compliance rate.[5] Because this error has in fact been established, the Department is not in a position to object to the district court's finding that the Department's compliance rate was overstated. Either reason for discounting the compliance rates supports the finding of substantial noncompliance.

 Finally, no particular percentage of compliance can be a safe-harbor figure, transferable from one context to another. Like 'reasonableness,' *see Caswell v. Califano,* 583 F.2d 9, 18 (1st Cir.1978), 'substantiality' must depend on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest. In the present case, the interest at stake—entitlement to subsistence-level benefits—is great, *see Mathews v. Eldridge,* 424 U.S. 319, 340–43, 96 S.Ct. 893, 904–06, 47 L.Ed.2d 18 (1976); *Goldberg v. Kelly,* 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970), making the consequences of failure to comply quite serious. The district court properly weighed the seriousness of the harm, with which it was familiar through its supervision of the consent decree, in considering the substantiality of the Department's compliance. It is for this reason that the 96% compliance rate in *Shands v. Tull, supra,* cannot be a touchstone of substantiality. That case involved delays in hearing appeals from denials of AFDC benefits. If the reversal rate of initial determinations of ineligibility is small, as it was in *Shands,* delays in appeals will have markedly less impact on recipients as a class than the same rate of delay in initial eligibility determinations. This consideration therefore supports the district court's finding of substantial noncompliance. Because of this support as well as the other support discussed above, we are not left, after reviewing all the evidence, "with the definite and firm conviction that a mistake has been committed," *United States v. Gypsum Co.,* 333 U.S. at 395, 68 S.Ct. at 541.[6]

5. The revised compliance figures for the approximate period considered by the district court in framing its order are as follows:

| 1980 | AFDC | GR |
| --- | --- | --- |
| March | 95.5% | 90.6% |
| April | 94.7% | 91.5% |
| May | 95.8% | 93.3% |
| June | 94.7% | 93.4% |
| July | 94.5% | 90.3% |
| August | 90.1% | 87.4% |
| September | 88.7% | 84.8% |
| October | 91.3% | 86.8% |
| November | 90.4% | 86.9% |
| December | 90.1% | 84.6% |
| 1981 | | |
| January | 89.7% | 86.4% |
| February | 94.2% | 92.1% |
| March | 95.4% | 93.7% |
| April | 94.7% | 93.3% |

| 1981 | AFDC | GR |
| --- | --- | --- |
| May | 96.3% | 93.5% |
| June | 95.5% | 94.5% |
| July | 93.0% | 92.0% |
| August | 93.0% | 90.2% |

The revision decreased AFDC compliance rates from 1.0% to 2.4%, and GR rates from 2.1% to 3.4%.

6. Because we uphold the district court's finding of substantial noncompliance, we need not consider the plaintiffs' argument that absolute compliance should be required here, where the decree, whose language is absolute, merely restates the statutory requirements and where individual entitlements are involved.

The Department's argument that the intent of the parties in entering the decree should control the degree of compliance required seems to

In addition to its argument concerning the rates of compliance within the time limits of the decree, the Department also urges that, because most applicants are subject only to limited delay beyond those limits, its compliance is substantial. Its assertion is based on statistics from a study conducted during June and July 1979 that charted the percentages of applications processed at five-day intervals after the time limits prescribed by the decree had passed.[7] These statistics show at most, however, that the Department substantially complied with a more generous standard than that demanded by the consent decree and the applicable laws. Indeed, the time periods which it claims to meet substantially are half again as long, or longer, than those in the decree. Unless the Department shows impossibility or succeeds in modifying the decree and laws in question, *see* Parts II B, V below, it is not at liberty to substitute these standards. *Cf. Thompson v. Walsh,* 481 F.Supp. 1170, 1176 (W.D. Mo.1979).

The Department finally argues that its AFDC compliance rate should be deemed substantial because of the inaction of the Department of Health and Human Services ("HHS"), which has the authority to withhold federal funding when states fail to comply with federal timeliness standards.[8] HHS might be reluctant to exercise this power, however, because the remedy is drastic; in any case its failure to withhold does not insulate the Department's actions from federal judicial review. *Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 1221, 25 L.Ed.2d 442 (1970).

## B

The Department also urges that its diligence and improvement in performance preclude a finding of contempt. This argument conflates two theories, however, each of which is flawed. The evidence of diligence cited by the Department might be sufficient to show good faith, but good faith is not a defense to civil contempt. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Sucrs. de A. Mayol & Co. v. Mitchell,* 280 F.2d 477, 481 (1st Cir.), *cert. denied,* 364 U.S. 902, 81 S.Ct 235, 5 L.Ed.2d 195 (1960). Conversely, impossibility would be a defense to contempt, *see Halderman v. Pennhurst State School & Hospital,* 673 F.2d 628, 638–39 (3d Cir.) (*en banc*), *cert. granted,* —— U.S. ——, 102 S.Ct. 2956, 73 L.Ed.2d 1348 (U.S., 1982), but the Department had the burden of proving impossibility, *see United States v. Fleischman,* 339 U.S. 349, 362–63, 70 S.Ct. 739, 746, 94 L.Ed. 906 (1950); *United States v. Rylander,* 656 F.2d 1313, 1316 (9th Cir.1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 2006, 72 L.Ed.2d 464 (1982), and that burden is difficult to meet. *See Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 713 (D.C.Cir.1975); *Aspira of New York, Inc. v. Board of Education,* 423 F.Supp. 647, 654 (S.D.N.Y.1976). Although diligence is relevant to the question of ability to comply, *see Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union,* 531 F.2d 617, 621 (D.C.Cir.1976); *Aspira, supra,* the Department's evidence of dili-

---

be directed toward the plaintiffs' argument for absolute compliance, and to that extent we need not consider it either. To the extent that it seeks to establish not only that substantial compliance is enough, but also that that standard has been met, however, we find it unpersuasive. The Department cites no evidence to support its assertion that the plaintiffs would have been satisfied with 95% compliance in 1975, nor has it demonstrated that degree of compliance now.

**7.** The Department's statistics showed the following rates of processing:

| | | June 1979 | July 1979 |
|---|---|---|---|
| AFDC: | 30 days: | 90.1% | 85.4% |
| | 35 days: | 95.1% | 92.1% |
| | 40 days: | 97.2% | 95.3% |
| | 45 days: | 98.2% | 97.3% |
| GR: | 22 days: | 85.3% | 79.0% |
| | 27 days: | 92.5% | 89.4% |
| | 32 days: | 95.7% | 94.2% |
| | 37 days: | 97.8% | 96.1% |

**8.** The Secretary of HHS may withhold funds under 42 U.S.C. § 604(a)(2) (1976) whenever a state fails to comply with any requirement of 42 U.S.C. § 602(a) (1976 & Supp. IV 1980). Section 602(a)(10) and regulations promulgated

gence alone does not satisfy that burden. The affidavits of Department officials, cited as proof of inability to comply, detail the administrative changes made in order to decrease delays. These efforts, however, are simply what the law demands and what the Department agreed to do. *Cf. Thompson v. Walsh,* 481 F.Supp. at 1176. The fact that efforts and improvements have been made does not prove that further improvement would be impossible. Indeed, the test of impossibility may be particularly strict in a case such as this one, in which the needs of applicants are urgent. *See White v. Mathews,* 559 F.2d 852, 859 (2d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1979). The district court's finding that the decree was not one "with which substantial compliance is impossible" is therefore not clearly erroneous.

### III

The second issue raised by the Department on appeal concerns sovereign immunity. It claims that the eleventh amendment bars the remedy of fines payable to eligible applicants whose eligibility determinations are delayed, on the ground that complete compliance will be impossible and that the consequent unavoidable fines will be an impermissible order to "a State to provide money to plaintiffs." *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 29, 101 S.Ct. 1531, 1546, 67 L.Ed.2d 694 (1981). We find this argument unconvincing for two reasons.

First, both the district court and this court have assumed, without deciding, that substantial compliance will satisfy the decree, and have concluded that such compliance is not impossible.[9] Second, even if complete rather than substantial compliance were demanded, impossibility would be a defense to a motion for contempt, as we have indicated above. In either case the fines are avoidable, so the Commonwealth would not be faced with an inescapable order to pay money out of its treasury. Therefore, even if we assume that immunity would bar such an inescapable order in the contempt context,[10] no eleventh amendment issue is present in this case, for it is clear that sovereign immunity does not bar remedial or coercive fines that are actually incurred, though theoretically avoidable. *Hutto v. Finney,* 437 U.S. 678, 690–91, 98 S.Ct. 2565, 2573–74, 57 L.Ed.2d 522 (1978). The court's power to order such contempt fines, like its power to order prospective payments generally, *see Milliken v. Bradley,* 433 U.S. 267, 289–90, 97 S.Ct. 2749, 2761–62,

---

thereunder set timeliness standards. *See* note 1 *supra.*

**9.** The fact that it has not complied does not prove, as the Department seems to argue, that it cannot. Moreover, even if compliance cannot be accomplished in an instant because of the necessity of developing procedures, training personnel, and the like, this momentary inability cannot be deemed an "impossibility." If it were, defendants could evade court orders simply by refusing to take preliminary steps toward compliance and claiming impossibility. We do not overlook the improvement the Department has made, but hold that the district court did not clearly err in finding further improvement possible. *Cf. Rodriguez v. Swank,* 496 F.2d 1110, 1113 (7th Cir.), *cert. denied,* 419 U.S. 885, 95 S.Ct. 151, 42 L.Ed.2d 125 (1974).

**10.** We are not certain that literally unavoidable fines ordered as a remedy for contempt would violate the eleventh amendment. It is well established that the fiscal consequences of prospective orders to comply with the law do not offend the principles of sovereign immunity. *Edelman v. Jordan,* 415 U.S. 651, 667–68, 94

S.Ct. 1347, 1357–58, 39 L.Ed.2d 662 (1974). It is also well established that such fiscal consequences may be compensatory. *Milliken v. Bradley,* 433 U.S. 267, 290, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977). Although it is hard to imagine circumstances in which a party could be held in contempt though unable to comply (*but cf. Halderman v. Pennhurst State School & Hospital,* 673 F.2d at 638–39 (finding of contempt in the face of supervening illegality of compliance not reviewable except via a motion to amend the decree, because contemner participated in changing the law)), a compensatory fine in those circumstances would seem no different than the "remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance" in *Hutto v. Finney,* 437 U.S. 678, 691, 98 S.Ct. 2565, 2574, 57 L.Ed.2d 522 (1978). In both cases a fine is expected to be paid, and in both the purpose is compensatory. To the extent that the fine's purpose is to compensate rather than coerce, it should make no difference that in the former case coercion is impossible.

53 L.Ed.2d 745 (1977); *Edelman v. Jordan,* 415 U.S. 651, 667–68, 94 S.Ct. 1347, 1357–58, 39 L.Ed.2d 662 (1974), is ancillary to its power to order compliance with the law. *Hutto v. Finney,* 437 U.S. at 691, 98 S.Ct. at 2574. That power does not evaporate when the cost of compliance is high. *Id.* at 690 n. 15, 98 S.Ct. at 2573 n. 15.

## IV

As a subsidiary issue, the Department also questions the district court's power to prescribe a remedy for delays in the GR program, arguing that the remedy was a matter of state law that should have been certified. The first problem with this argument is that it confuses the court's power and its discretion. It is true that a federal court may decline to take jurisdiction over a pendent state claim, but this does not deprive it of the power to hear the pendent claim if it chooses to, and indeed its discretion to dismiss should not be exercised if economy and convenience favor trying the issues together. *See Hagans v. Lavine,* 415 U.S. 528, 545–46, 94 S.Ct. 1372, 1383–84, 39 L.Ed.2d 577 (1974). It is also true that a federal court may abstain from deciding a state law question that is unsettled, *see Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 27–28, 79 S.Ct. 1070, 1072–1073, 3 L.Ed.2d 1058 (1959), or that may be illuminated by a pending state court proceeding, *see Kartell v. Blue Shield of Massachusetts, Inc.,* 592 F.2d 1191, 1193–94 (1st Cir.1979), but again this is a matter of discretion. *See Thibodaux,* 360 U.S. at 27 n. 2, 79 S.Ct. at 1072 n. 2. The Department offers no reason why the district court abused its discretion either in taking jurisdiction over the pendent claim initially or in failing to abstain. Because the court

had the power to adjudicate the issue, it also had the power to order appropriate relief, including the remedial fine. *See Hutto v. Finney,* 437 U.S. at 691, 98 S.Ct. at 2574.

The second problem with the Department's argument is that it overlooks what the court construed. It makes no difference if state law was unclear, because the court was interpreting the consent decree, not the underlying law. There is no state court to which the question of interpreting the decree could be certified or to whose authority and expertise the federal court could defer by abstaining. The remedy it ordered was therefore proper.

## V

Finally, the Department argues that the district court erred in failing to modify the consent decree to allow, in addition to thirty days for determining eligibility for AFDC, eight days to mail assistance checks to those found eligible, rather than the current total limit of thirty days. The Department sought the modification on the basis of mistake of law: it argued that the underlying law actually requires only that decisions be made within the thirty-day time period and that checks be mailed within a reasonable time period thereafter, making the decree's demands more stringent than the law's. It therefore urges that the AFDC provisions of the decree be modified so as to mirror the GR provisions, allowing eight days as a reasonable period for sending checks.

The issue on appeal is again a narrow one, for the district court's refusal to exercise its power to modify under Fed.R.Civ.P. 60(b) [11] is reviewable only for abuse of dis-

11. Rule 60(b) provides in relevant part:

 *Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.*

 On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence; surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discov-

ered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the

cretion. *See Browder v. Director, Department of Corrections,* 434 U.S. 257, 263 n. 7, 98 S.Ct. 556, 560 n. 7, 54 L.Ed.2d 521 (1978); *Manning v. Trustees of Tufts College,* 613 F.2d 1200, 1204 (1st Cir.1980); *Pagan v. American Airlines, Inc.,* 534 F.2d 990, 992–93 (1st Cir.1976). No abuse of discretion has been shown here.

In *United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), the Supreme Court identified the conditions that warrant modification under Fed.R.Civ.P. 60(b)(5): [12]

> The inquiry for us is whether the changes [in conditions since the entry of the decree] are so important that dangers, once substantial, have become attenuated to a shadow.... Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

It is true, as the Department argues, that changes in the law may satisfy this standard. *See System Federation No. 91 v. Wright,* 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961). In the case before us, however, no change in the law has occurred, nor has any court interpreted the law underlying the decree in a manner different than the parties understood when they consented. The Department therefore requests in one breath that the law be reinterpreted and the decree modified because "it is no longer equitable that the judgment

should have prospective application" under rule 60(b)(5). This technique, however, would transform the modification procedure into an impermissible avenue of collateral attack on the interpretation to which the parties consented. *See Ackermann v. United States,* 340 U.S. 193, 198, 71 S.Ct. 209, 211, 95 L.Ed. 207 (1950) (modification is not a substitute for appeal); *Swift,* 286 U.S. at 119, 52 S.Ct. at 464 (court may not reconsider propriety of decree as framed); *Coalition of Black Leadership v. Cianci,* 570 F.2d 12, 16 (1st Cir.1978) (rule 60(b)(5) cannot be used to vacate a decree when the legal interpretation on which it was based has not been directly overruled; proper course would have been to withhold consent and appeal any adverse judgment). Because no change was alleged, the district court properly denied the Department's motion for modification.

Moreover, if we were to reach the merits, it is not clear to us that the Department's proposed new interpretation of the law is correct. Massachusetts's regulation provides that "[a] decision as to eligibility or ineligibility must be made within thirty (30) days after date of application.... When the decision is made that the applicant is eligible for assistance, such assistance shall be given promptly." Mass.Admin.Code tit. 106, § 302.230 (1978). The Department interprets "promptly" to mean within a reasonable time following the thirty-day period. The federal regulation, however, provides:

operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

If, as the plaintiffs note, the Department's motion were brought under rule 60(b)(1) (mistake), it would be barred as untimely and the district court would have lacked the power to modify the decree. *See* 7 J. Moore & J. Lucas, *Federal Practice* ¶ 60.19, at 226 (1982). The plaintiffs go on to argue, however, that the court lacked the power to modify even if the Department's motion were brought under rule 60(b)(5) or (6), because such motions must be made within a reasonable time, and they claim it was unreasonable to defer the objection until several years after the entry of the decree when

the underlying law remained constant. What constitutes 'reasonable time' is so dependent on the particular circumstances of each case, however, that this question becomes inseparable from the merits. Our role on appeal in either case is to determine whether the district court abused its discretion in granting or denying relief. *See id.* at 226–27. It is therefore improper to say the district court lacked the power to modify.

12. *Swift* dealt with the court's inherent power to modify, 286 U.S. at 114, 52 S.Ct. at 462, but rule 60(b) codifies that power and the standard for its exercise. *See Theriault v. Smith,* 523 F.2d 601, 601 n. 3 (1st Cir.1975); *Lubben v. Selective Service System Local Board No. 27,* 453 F.2d 645, 651 (1st Cir.1972).

A decision shall be made promptly on applications, pursuant to reasonable State-established time standards not in excess of ... 45 days for ... AFDC.... Under this requirement, the applicant is informed of the agency's time standard in acting on applications, which covers the time from date of application under the State plan to the date that the assistance check, or notification of denial of assistance or change of award is mailed to the applicant or recipient.

45 C.F.R. § 206.10(a)(3) (1981). Because the applicant must be informed of the state time standard within which assistance checks are issued, Massachusetts may be bound to issue checks within thirty days because that is the only definite time standard it announced. At best, both interpretations are plausible. The district court hardly abused its discretion in holding the Department bound by a plausible interpretation of the law to which it consented.

▮ This result is not changed by the cases that hold that decrees may be modified even in the absence of changed circumstances, if they prove unworkable on a better appreciation of the facts. *See United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 248–49, 88 S.Ct. 1496, 1499–1500, 20 L.Ed.2d 562 (1968); *Philadelphia Welfare Rights Organization v. Shapp,* 602 F.2d 1114, 1120–21 (3d Cir.1979), *cert. denied,* 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980); *Chance v. Board of Examiners,* 561 F.2d 1079, 1086 (2d Cir. 1977); *King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 418 F.2d 31, 35 (2d Cir. 1969). The rationale of these cases is that when the relevant facts turn out to be different than supposed at the start, the decree may be altered to produce the originally intended result. Thus, in *Philadelphia Welfare Rights Organization,* the decree

mandating specific quotas of medical screenings of welfare recipients was altered because of the *parties'* errors in predicting the numbers of eligible recipients and the rate at which they would fail to keep appointments. In the present case, by contrast, no circumstance appears different now than it did in 1975, except perhaps the degree to which the Department regrets its consent. Regret intensified upon reflection is not, however, cause for modification. Indeed, whenever a decree merely restates the law, few circumstances except compliance [13] should justify modification lest the court usurp legislative power.

Because the Department has raised no "other reason justifying relief" so as to invoke Fed.R.Civ.P. 60(b)(6),[14] the judgment of the district court is AFFIRMED.

---

13. Compliance may justify dissolving such an injunction. *See, e.g., SEC v. Warren,* 583 F.2d 115, 121 (3d Cir.1978); *Tobin v. Alma Mills,* 192 F.2d 133, 136–37 (4th Cir.1951), *cert. denied,* 343 U.S. 933, 72 S.Ct. 769, 96 L.Ed. 1342 (1952). When dissolution would reinstate the harm prohibited by the decree, however, the decree may persist even in the face of compli-

ance. *See, e.g., Swift,* 286 U.S. at 116, 117–18, 52 S.Ct. at 463–64.

14. Because we find no merit in the Department's claims under rule 60(b)(5) and (6), we need not consider the plaintiffs' argument that errors of law are remediable only under rule 60(b)(1) and that the claims are therefore barred by its one-year statute of limitation.