# United States Court of Appeals
## For the First Circuit

Nos. 19-1262
    19-1767

ROSIE D., by her parents John and Debra D.; TYRIEK H., by his
mother Christine H.; JOSHUA D., by his mother Emelie D.; SHEENA
 M., by her mother Deborah D.; DEVIN E., by his grandmother
 Barbara E.; ANTON B., by his mother Lisa A.; SHAUN E., by his
 grandmother Jacquelyn E.; JERRY N., by his mother Susan P. on
      behalf of themselves and all others similarly situated,

Plaintiffs, Appellees,

NATHAN F., by his mother Tracey F.; SAMUEL L.; JOSE M.; TERRENCE
 M.; MARC ST. L.; NATISHA M.; SARAH B.; FORREST W.; JASON S.;
 SHENTELLE G.; CHRISTINE Q.; KRISTIN P.; CHRIS T.; CHELSEA T.;
   RALPH B.; TEVIN W.; DANIELLE H.; JANICE B.; KRISTIN H.,

Plaintiffs,

v.

CHARLES D. BAKER, Governor of Massachusetts; MARYLOU SUDDERS,
 Secretary of the Executive Office of Health and Human Services;
    MICHAEL HEFFERNAN, Secretary of the Executive Office of
Administration and Finance; DANIEL TSAI, Assistant Secretary for
MassHealth,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Lipez, Circuit Judges.

Daniel J. Hammond, Assistant Attorney General, with whom Maura Healey, Attorney General of Massachusetts, and Douglas S. Martland, Assistant Attorney General, were on brief, for appellants.

Steven J. Schwartz, with whom Cathy E. Costanzo, Kathryn Rucker, Center for Public Representation, Daniel W. Halston, Wilmer Hale, LLP, and Frank Laski were on brief, for appellees.

Martha Jane Perkins and National Health Law Program on brief for National Health Law Program, American Academy of Pediatrics, Massachusetts Chapter of the American Academy of Pediatrics, Judge David L. Bazelon Center, and National Center for Youth Law, amici curiae.

———————————

May 4, 2020

———————————

**LYNCH**, **Circuit Judge**.  We issue this narrow opinion in response to an appeal from the denial of the "Motion Regarding Substantial Compliance and To Terminate Monitoring and Court Supervision" filed by the Commonwealth Defendants in long-running class-action litigation.  The underlying suit concerns the Commonwealth's compliance with federal statutory requirements for provision of services to a plaintiff class of Medicaid-eligible children with serious emotional disturbances.  See 42 U.S.C. §§ 1396a(a)(8), -(a)(10)(A), -(a)(43), 1396d(a)(4)(B), -(r)(5).  For the reasons that follow, we reverse the district court's order denying Defendants' motion and remand for further proceedings.

Plaintiffs first sued the Commonwealth in 2001.  In 2006, the district court held a non-jury trial and issued an opinion finding the Commonwealth liable for violating Medicaid provisions as to "reasonable promptness" and "early and periodic screening, diagnosis, and treatment" ("EPSDT") services.  See Rosie D. v. Romney, 410 F. Supp. 2d 18 (D. Mass. 2006).

The court sought filings from the parties as to appropriate remedial orders.  In 2007, the district court issued a final judgment, in the form of an injunction, largely adopting the Commonwealth's proposed remedial plan.  Part I of the Judgment was broken down into sections A ("Education and Outreach and Screening"), B ("Assessment and Diagnosis"), C ("Intensive Care Coordination and Treatment Planning"), D ("Covered Services"), and

E ("Implementation," including data collection and monitoring as to the Commonwealth's compliance with the Judgment). The reporting and monitoring obligations set forth in sub-section I.E.3[1] were set to "terminate five years after the date of entry of this Judgment," or in approximately July 2012. A court monitor was appointed in April 2007 and has continued. The Judgment included a provision for its own modification, which can be ordered "for good cause upon application to the Court by either party; or . . . by agreement of the parties."

At the end of June 2012, the district court proposed that the sub-section I.E.3 reporting and monitoring requirements continue while the parties negotiated a "plan for disengagement." The parties agreed and submitted a joint disengagement plan in June 2013. By agreement of the parties, the court extended the Court Monitor's tenure for discrete six-month periods ten times. Each of these extensions constituted a modification of the Judgment by the agreement of the parties.

The period of agreed upon extensions ended on December 31, 2018.[2] On September 27, 2018, at the district court's

---

[1] These obligations include designating a compliance coordinator, holding quarterly compliance meetings, submitting semi-annual compliance reports, and appointing a court monitor.

[2] The district court has extended the Court Monitor's tenure two more times over the Commonwealth's objection: once until June 30, 2019 while the motion was pending, and once while this

direction, the Commonwealth filed the motion at issue. The Commonwealth's motion asked that the court "terminat[e] all monitoring and reporting requirements set forth in the Judgment." This was not a request to modify the Judgment to end the monitoring and reporting requirements early, before the final agreed upon extension of the Court Monitor's term expired on December 31, 2018. The Commonwealth was clear that it was "not asking to modify or terminate the Judgment in this case."[3]

The Commonwealth's motion presented three arguments:

> First, the Judgment expressly provided that the monitoring and reporting requirements would "terminated" [sic] in 2012, and the Court should now, based on the substantial compliance showing, give effect to that mandate. Second, where, as here, the state government defendants have substantially complied with a remedial judgment, there is no basis for ongoing court oversight. See Milliken v. Bradley, 433 U.S. 267, 282 (1977); Horne v. Flores, 557 U.S. 433 (2009). Finally, there has been no proven non-compliance through any motion for or finding of contempt against the Defendants.

---

appeal is pending, "unless and until the Court of Appeals orders differently."

[3] The dissent mischaracterizes the case before the district court and before us in several ways, including when it characterizes this appeal as about "two competing requests for modifications of the judgment." Regardless of how the Commonwealth's motion is styled, the district court's decision went beyond declining to terminate monitoring requirements early and instead modified the Judgment to extend the monitoring requirements. Our task is to review that decision.

The Commonwealth's motion does not ask to vacate the entire injunction. At oral argument, the Commonwealth was explicit that it agrees that the district court should retain jurisdiction over the case and that Plaintiffs remain free to pursue claims of violation of the express terms of the injunction.

In their response to the motion, Plaintiffs agreed that the Commonwealth was in substantial compliance with sections I.A and I.E of the Judgment but argued that the Commonwealth was not in compliance with large parts of the Judgment, especially provisions in sections I.B, I.C, and I.D. The Plaintiffs agreed the court could "terminate monitoring and reporting, and relinquish active supervision over paragraphs 2-11, 36, and 39-45." The Plaintiffs argued the court needed to continue monitoring for "all other sections of the Judgment."

The district court denied the Commonwealth's motion in its entirety,[4] even though it only based its denial on and only analyzed the Commonwealth's compliance with section I.C. The court specifically declined to address the Plaintiffs' arguments about sections I.B or I.D of the Judgment. It held that the Commonwealth was out of compliance as to section I.C of the Judgment with respect to "reasonable promptness." It concluded as to "reasonable

---

[4]    The court denied the entire motion after it noted that "[n]o further oversight or monitoring is needed" for section I.A of the Judgment.

promptness" that the Judgment incorporates a requirement that services be provided to class members within fourteen days. It also said the fourteen-day requirement was itself imposed by regulation. In denying the motion, the district court stated that it "retain[ed] the power and the responsibility to continue its supervision and monitoring, with the essential assistance of the Court Monitor, until reasonable compliance is achieved," presumably as measured relative to the fourteen-day standard.[5]

The district court's analysis was flawed from the outset. While it declined to decide who bore the burden of proof, it treated indefinite continuation of the monitoring as the baseline from which it would depart only if the Commonwealth demonstrated (or the Plaintiffs demonstrated lack of) substantial compliance with the Judgment. To that end, the district court concluded its analysis by stating, "For almost seven years, Defendants have tacitly agreed to the extension of the monitoring function. They have failed to show that it must end now." But the extensions of the monitoring period agreed to by the parties

---

[5] Since the monitoring provisions were set to expire in 2012 and only continued until the end of 2018 with the consent of both parties, the district court's statement constitutes a continuation of the Judgment, which gives us jurisdiction to hear this appeal under 28 U.S.C. § 1292(a)(1). See Sierra Club v. Marsh, 907 F.2d 210, 212-13 (1st Cir. 1990).

The Commonwealth also appealed the district court's decision to extend the tenure of the Court Monitor while this appeal is pending. The analysis as to this appeal is the same.

were set to terminate automatically on December 31, 2018. It was a further extension of the monitoring period, not its termination, that constituted a modification of the Judgment, which, without an agreement of the parties, could only be accomplished "for good cause upon application to the Court by either party." Neither that "good cause" standard nor any examination of it appear anywhere in the district court's analysis.[6]

A judgment may be modified if "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or . . . any other reason that justifies relief." Fed. R. Civ. P. 60(b)(5)-(6). Interpreting Fed. R. Civ. P. 60(b) in the analogous context of a consent decree arising, like this Judgment, in a litigation demanding institutional reform, the Supreme Court found that the "party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." Rufo v. Inmates of Suffolk Cty. Jail, 502 U.S. 367, 383 (1992); see also Quinn v. City of Bos., 325 F.3d 18, 45 (1st Cir. 2003) (Lipez, J., dissenting) ("While a

---

[6] We note as well that the district court undertook this analysis in the context of the Commonwealth's motion, not in response to any motion from the Plaintiffs requesting modification. And it never entered anything into the docket suggesting the Judgment had been modified, as it had done previously.

modification of a consent decree is warranted if there is 'a significant change either in factual conditions or in law,' 'a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree.'" (citation omitted) (quoting Rufo, 502 U.S. at 383-84)). Elaborating on that standard, the Court set forth circumstances in which changed facts warrant modifying a decree, including "when changed factual conditions make compliance with the decree substantially more onerous[,] . . . when a decree proves to be unworkable because of unforeseen obstacles[,] . . . or when enforcement of the decree without modification would be detrimental to the public interest." Rufo, 502 U.S. at 384. Finally, the Court clarified that modification should "ordinarily . . . not be granted" if the changed facts "actually were anticipated" at the time of the initial decree, and that, where changed circumstances do warrant a modification, the "court should consider whether the proposed modification is suitably tailored to the changed circumstance." Id. at 383-85.

The district court failed to apply anything resembling Rufo's standard in examining whether it was appropriate to modify the Judgment to extend the monitoring requirements. Instead, it focused on whether the Commonwealth had achieved substantial compliance, an inquiry that would have been appropriate if the Commonwealth was seeking to modify the Judgment. That failure is

not academic. The power of federal courts to interfere with the policy prerogatives of a state's democratically elected government is limited "to reasonable and necessary implementations of federal law." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 441 (2004) (expressing concern that overly broad enforcement against states "may improperly deprive future officials of their designated legislative and executive powers" or "lead to federal-court oversight of state programs for long periods of time even absent an ongoing violation of federal law"). The precarious balance between protecting state sovereignty and implementing the supremacy of federal law undergirds the practical enforcement of our federal system. See U.S. Const. amend. XI (restricting the ability of federal courts to hear suits against states); Ex parte Young, 209 U.S. 123 (1908).

Furthermore, any such modification cannot be used to sidestep the demanding requirement needed to get an injunction in the first place. See Salazar v. District of Columbia, 896 F.3d 489 (D.C. Cir. 2018); see also Fed. R. Civ. P. 65(d) (requiring that an order granting an injunction "state its terms specifically" and "describe in reasonable detail" the "acts restrained or required").

The district court's denial of the Commonwealth's motion also is not justified as a way to "enforce its own orders." "A court's power to enforce a judgment is confined to the four corners

- 10 -

of the judgment itself." Harvey v. Johanns, 494 F.3d 237, 244 (1st Cir. 2007). This is to make sure the parties do not "short-circuit the usual adjudicative processes" and violate the principles of fair notice. Id. Nothing gave the Commonwealth fair notice that the fourteen-day standard would be treated as an independently enforceable provision of the Judgment by which the Commonwealth would be in noncompliance with the Judgment if its contractors did not consistently meet the fourteen-day standard.

In addition to the district court's failure to apply the proper standard, the Commonwealth also argues that its substantive holdings were in error. We agree that it was error for the district court to conclude, at least without proper analysis, that the fourteen-day standard was required by federal law and that the Judgment set forth an obligation by the Commonwealth to see that its contractors provided services within fourteen days.[7]

The fourteen-day standard crucial to the district court's conclusion does not appear in the underlying Medicaid statute or regulation. Federal Medicaid law requires that states must provide medical assistance with "reasonable promptness," 42 U.S.C. § 1396a(a)(8), and must create "reasonable standards . . .

---

[7] The dissent is incorrect that the district court treated the failure of the Commonwealth's contractors to universally meet the fourteen-day standard as mere "evidence that the processes employed by the Commonwealth were not sufficient to satisfy the regulation." The fourteen-day standard was the sole benchmark employed by the court.

- 11 -

for determining eligibility for and the extent of medical assistance under the plan," id. § 1396a(a)(17). To implement both requirements, federal Medicaid regulation, 42 C.F.R. § 441.56(e), requires the following:

> [T]he [Commonwealth] must set standards for the timely provision of EPSDT services which meet reasonable standards of medical and dental practice, as determined by the [Commonwealth] after consultation with recognized medical and dental organizations involved in child health care, and must employ processes to ensure timely initiation of treatment, if required, generally within an outer limit of 6 months after the request for screening services.

Neither the statute nor the regulation specifies a time for "reasonable promptness," much less fourteen days. The federal Medicaid regulation at 42 C.F.R. § 441.56(e) requires that states establish standards in consultation with medical professionals, generally within six months after the request for screening services. The Commonwealth has done that and set standards for compliance for its contracted service providers who actually provide these services to the Plaintiff class.

The crux of the Plaintiffs' argument is not that the Commonwealth has failed to set standards, but that it has violated the Judgment if the contractors who are obligated to meet those standards fail to achieve the initiation of services within fourteen days. The plain text of the statute and regulation do not compel the Plaintiffs' conclusion. True, the regulation

- 12 -

requires the Commonwealth to "employ processes to ensure timely initiation of treatment," but there is no dispute that it has employed at least some processes to ensure compliance. A requirement to "employ processes" to meet a goal is not the same as a requirement that the goal be met in all cases. It is possible that the processes that have been employed by the Commonwealth are not sufficient to satisfy the regulation, or that the Commonwealth's actual performance on timeliness still falls outside 42 U.S.C. § 1396a(a)(8)'s "reasonable promptness" requirement. But it was error for the district court to conclude with such little formal analysis that the Commonwealth's failure to achieve universal compliance within the fourteen-day standard was, by itself, a violation of federal law. See Jeffrey Chen, Note, In the Nick of Time: Using the Reasonable Promptness Provision to Challenge Medicaid Spending Cutbacks, 15 Yale J. Health Pol'y L. & Ethics 349, 374 ("[T]he regulations and case law related to the Reasonable Promptness Provision do not provide a clear answer to the question of what constitutes a violation of reasonable promptness.").

Nor has anything in the text of the Judgment at any time imposed an obligation on the Commonwealth to see that its providers initiated services within a fourteen-day period. The Judgment was only formally amended once, in 2009, in ways not relevant to this appeal. We reject the Plaintiffs' argument that the Judgment,

despite its plain text, was so modified. In 2012, the Commonwealth notified the court in a letter that it had adopted a standard for its contractors to provide services. A March 20, 2012, district court order approved the Commonwealth's submission that it wished to use a fourteen-day standard for its contractors. That approval order was not a modification of the Judgment. See Fed. R. Civ. P. 60 (describing the grounds and procedure for modifying a judgment); Rufo, 502 U.S. at 383-85 (interpreting Fed. R. Civ. P. 60 to set standards for modification of a consent decree in a similar context to that of the Judgment at issue here). Nor was it an agreement by the Commonwealth that the fourteen-day standard for its contractors could be entered into the Judgment or was a standard to which it could be held in violation of the Judgment. No order modified the Judgment to incorporate the fourteen-day standard.[8]

---

[8] The dissent improperly attempts to recharacterize the Commonwealth's positions and arguments related to its initial adoption of the fourteen-day standard in 2012.

In 2012, the Commonwealth consulted with medical professionals to establish a fourteen-day access standard, in line with its obligations under the Medicaid regulations. See 42 C.F.R. § 441.56(e). It had previously used a three-day standard, but that standard was never officially adopted for purposes of the Medicaid regulation.

On February 28, 2012, the Commonwealth notified the court in a letter that it intended to formally adopt the fourteen-day standard despite the Plaintiffs' disagreement: "This letter, then, serves not to argue the merits of the dispute, but merely to clarify the defendant's understanding of the mechanics of this process . . . ."

Although the district court said it "approved" this standard and notified the parties that it would "be monitoring

The Commonwealth also did not waive any right to file the instant motion when it agreed to extend the monitoring provisions from July 2012 while it worked with the Plaintiffs towards a negotiated end to the injunction. That agreement ended as of December 31, 2018.

The issue is not whether the Judgment contained a "reasonable promptness" requirement that the Commonwealth was obligated to meet. The issue is whether the Judgment ever required the Commonwealth to meet a fourteen-day standard for its contractors to deliver services. It did not. The Plaintiffs have never proven a case that failing to meet a fourteen-day standard is a violation of federal law, nor have they attempted to, and the Commonwealth has never agreed failure to comply with the fourteen-day standard would violate federal law. The fourteen-day standard is not a term in the Judgment.

On remand, the judge assigned to the case,[9] on proper application, may examine whether the Plaintiffs have demonstrated

---

data regarding access carefully," it did so only after the Commonwealth assured it at a hearing that it did not "have any problem reporting to the Court and the plaintiffs as to how that's going."

As the Commonwealth argues to us, this "sua sponte" "purpot[ed]" approval was never part of a "litigated dispute" over the timeliness standard, as the dissent claims.

[9] Judge Ponsor, who issued the order on appeal, is no longer assigned to this case. See Rosie D. v. Baker, 362 F. Supp. 3d 46, 49 n.5 (D. Mass. 2019) ("Plaintiffs' additional arguments

good cause to modify the Judgment to extend the monitoring requirements under the framework provided by Rufo. It may also address the Plaintiffs' arguments about sections I.B and I.D of the Judgment and any other arguments about the Medicaid reasonable promptness requirements, and the Defendants' arguments concerning its other grounds for the motion, including the effects of Milliken v. Bradley, 418 U.S. 717 (1974), and Horne v. Flores, 557 U.S. 433 (2009), on the Commonwealth's motion. As the Commonwealth concedes, the Plaintiffs are free to pursue claims of violation of the express terms of the Judgment, including that the Commonwealth is in violation of the Judgment because a fourteen-day standard is required by federal law. We do not decide whether the Plaintiffs are prevented on remand from moving, under the Rules, for the district court to incorporate a timeliness standard for the provision of ICC services into the Judgment.

The denial by the district court is reversed and the case is remanded for further proceedings. No costs are awarded.

**-Dissenting Opinion Follows-**

---

. . . may be taken up, as needed, by the judge to whom this case will now be transferred."). It has been reassigned to Judge Stearns. Order Transferring Case Pursuant to Local Rule 40.1(I), Rosie D., 362 F. Supp. 3d 46 (D. Mass. 2019) (ECF No. 882).

LIPEZ, **Circuit Judge, dissenting**.  The majority's analysis reveals a misunderstanding of the district court's decision, a failure to grasp the history of this case, and a disregard for the district court's careful attention to this case over many years.  As a result, the majority reaches two erroneous conclusions: (1) that the district court's detailed, forty-five page analysis of the Commonwealth's non-compliance with the judgment and federal law was somehow insufficiently "formal" to justify its decision to modify the judgment to extend the period for compliance monitoring, and (2) that the district court could not consider the Commonwealth's non-compliance with its own fourteen-day reasonable promptness standard as evidence of good cause for that modification.  Both conclusions reflect the triumph of form over substance.  We should affirm the district court's decision, solidly grounded as it is in the law and the facts of a lengthy dispute so consequential for thousands of children in Massachusetts.

## I.

My colleagues fail to adequately describe either the posture of the case at the time the district court denied the Commonwealth's request to terminate compliance monitoring or the extensive litigation and negotiation that preceded the Commonwealth's adoption of the fourteen-day reasonable promptness standard.  Hence, before setting forth my analysis, I must

supplement the majority's abbreviated and misleading recitation of the facts.

This case was first filed nearly twenty years ago by a class of Medicaid-eligible children suffering from serious emotional disturbances ("SED") and their parents. After a lengthy bench trial, the district court ruled that the Commonwealth had violated federal Medicaid provisions mandating EPSDT services, as well as the statute's "reasonable promptness" requirements for providing those services to children suffering from SED. Rosie D. v. Romney, 410 F. Supp. 2d 18, 54 (D. Mass. 2006).

In 2007, in the aftermath of that liability determination, the district court entered a detailed judgment to remedy the federal law violations found in its liability opinion, including the Medicaid Act's "reasonable promptness" provision, 42 U.S.C. § 1396a(a)(8). Three aspects of that judgment are particularly relevant here. First, the judgment set reporting and monitoring requirements for the Commonwealth, including the appointment of a Court Monitor, that "will terminate five years after the date of entry of this Judgment," or in approximately July 2012. Second, it stated that its terms and deadlines were subject to modification "for good cause upon application to the court by either party," or "by agreement of the parties." Third, the judgment required that the Commonwealth create an Intensive Care Coordination ("ICC") service, available upon request to

- 18 -

eligible children, to coordinate across multiple service providers and create a coherent treatment plan tailored to each child's individualized needs. At the time, no such program was widely available for Medicaid-enrolled children in Massachusetts. See id. at 33, 38, 52-53.

In accordance with the deadlines set forth in the judgment, ICC services became available to eligible children in the summer of 2009. The Commonwealth also developed ICC program specifications. The original program specifications required providers to make telephone contact with family members within twenty-four hours of referral to the ICC service, and required providers "to offer a face-to-face interview with the family, which shall occur within three (3) calendar days to assess their interest in participation and gain consent for service."

In early 2010, the plaintiffs and the Court Monitor reported lengthy waiting lists for ICC. The plaintiffs filed a motion asking the court to order the Commonwealth to reduce wait times for ICC and other services, in order to comply with the "reasonable promptness" requirement of federal law and the judgment. The court reserved ruling on the motion and ordered the parties to collect, analyze, and report more data on timely access to ICC.

In a subsequent filing, the Commonwealth stated that new research on the timeliness standards in other states' analogous

programs, as well as consultations with experienced medical professionals, suggested the need to revisit the three-day access requirement. Importantly, the Commonwealth never stated that its obligation to provide ICC with reasonable promptness, measured by its own timeliness standard, was beyond the scope of federal law, the judgment, or the court's authority to enforce.

In November 2011, the court granted the plaintiffs' motion in part, directing the parties to meet with the Court Monitor, discuss the Commonwealth's proposal for a new reasonable promptness standard, and report back to the court. In January 2012, the Commonwealth reported that it intended to adopt a modified ICC access standard of fourteen days following the initial contact with a provider.

Although the plaintiffs initially objected to the new fourteen-day standard as too lengthy and not clinically supported, they reluctantly agreed to its implementation. The district court approved the fourteen-day access standard during a status conference. It then memorialized the approval in an order dated March 20, 2012. The order stated:

> The court approved a fourteen-day access standard for Intensive Care Coordination ("ICC") access. This means that no more than fourteen days will elapse between the initial contact with the ICC provider and the first offered date for a face-to-face meeting. The court approved this standard with the understanding that the contractual obligations of the ICC providers as contained

in their performance specifications would require that the period be three days for at least 50% of the clients, ten days for 75% of the clients, and no more than fourteen days for 100% of the clients.  The court will be monitoring data regarding access carefully to [e]nsure that the approval of the more generous standard does not result in longer delays.  Defendants will copy the court, Plaintiffs, and the court monitor with the monthly data reports on this issue.

The order did not modify the language of the judgment; rather, it expressed the court's approval of the Commonwealth's new reasonable promptness standard for measuring compliance in conformity with the extant portion of the judgment mandating the ICC service.

At the end of June 2012, at the court's prompting, the parties agreed to negotiate a "plan for disengagement."  The plan included various criteria, developed jointly by the parties, which the Commonwealth would endeavor to meet to ensure that all aspects of the judgment had been satisfied in advance of the wind-down of the court's oversight.  During this disengagement phase, the Commonwealth consented to approximately ten extensions of the Court Monitor's term, typically for six months at a time.  Each of these extensions constituted a modification of the judgment by agreement of the parties, extending its five-year sunset provision for reporting and monitoring.  The final consented-to order extending the Court Monitor's appointment was entered on April 7, 2017, and stated that, "per agreement of the parties," the

Monitor's appointment would be extended "through and including December 31, 2018."

In May 2018, after the plaintiffs reported that approximately two thirds of the Commonwealth's providers were regularly failing to offer initial ICC appointments within fourteen days, the plaintiffs filed a motion styled, "Motion to Improve Access to Remedial Services." The motion requested that the court enter an order "setting 2018 goals for access to ICC." At a hearing in June 2018, rather than ruling on the plaintiffs' motion, the court decided to "bring the matter to a head" and ordered the Commonwealth to file a motion regarding its substantial compliance with the judgment and the plaintiffs to file a corresponding motion to incorporate various disengagement criteria[10] as an order of the court. See Rosie D. v. Baker, 362 F. Supp. 3d 46, 57 (D. Mass. 2019). Both motions were filed in August 2018. The Commonwealth's motion was titled, "Motion Regarding Substantial Compliance and to Terminate Monitoring and Court Supervision." It asked the court to "terminat[e] all monitoring and reporting requirements set forth in the Judgment." The plaintiffs vigorously opposed the motion with respect to the ICC service and requested that the court extend the timeframe for

_____

[10] Notably, one of the disengagement measures that the plaintiffs asked the court to order was that "[b]y December 31, 2018, at least 70% of youth seeking ICC services will be offered an initial appointment within 14 days."

- 22 -

monitoring compliance with that portion of the judgment, due to the Commonwealth's failure to provide the ICC service with "reasonable promptness."

With the December 31, 2018 deadline for the end of the Court Monitor's appointment rapidly approaching, the court, over the Commonwealth's objection, issued an order extending the Court Monitor's appointment to June 30, 2019 to maintain the status quo while it considered the motions. The district court denied the Commonwealth's motion to terminate monitoring on February 7, 2019, and the Commonwealth promptly appealed.[11] See id. at 61-62. Monitoring remains ongoing at this time because the district court entered an order on July 1, 2019 extending the appointment of the Court Monitor during the pendency of this appeal.[12]

**II.**

The above history of the case captures its present procedural posture: essentially, two competing requests for modifications of the judgment, previously modified by consent of the parties to terminate monitoring on December 31, 2018. The

---

[11] Because the Commonwealth noticed its appeal before the district court ruled on the plaintiffs' motion to enter the disengagement criteria as an order of the court, the district court denied plaintiffs' motion without prejudice, explaining that, by appealing, the Commonwealth had deprived the district court of "the power to act substantively . . . until proceedings on appeal conclude."

[12] The Commonwealth also appealed this second order, and the two appeals were consolidated.

- 23 -

Commonwealth's motion, filed at the direction of the district court approximately four months prior to that date, sought to end monitoring early based on its purported demonstration of substantial compliance with the judgment. The plaintiffs, in opposing that motion, asked the court to extend the period for compliance monitoring beyond the existing December 31, 2018 deadline.[13]

Because the data regarding the Commonwealth's compliance (or lack thereof) with the judgment was undisputed, and both parties sought modifications of the same deadline in the judgment, the court determined that it was not necessary to assign the burden of proof. See Rosie D., 362 F. Supp. 3d at 57. In other words, because both parties bore the burden of proof for their own requested modifications, see Horne v. Flores, 557 U.S. 433, 447 (2009) (holding that the party seeking modification of a judgment bears the burden of proof), and those modifications were squarely at odds with one another, the district court conducted an

---

[13] To the extent that the majority suggests that the plaintiffs' request to extend monitoring was not a "proper application" for modification of the judgment because it was not presented as a separate motion, that position elevates form over substance. The majority cites no rule or language in the judgment requiring a formal motion for modification. In any event, as I have described, the district court effectively treated the plaintiffs' opposition as a motion -- it assessed whether the plaintiffs had carried their burden to demonstrate good cause for an extension of monitoring, or whether the Commonwealth had carried its burden to demonstrate good cause for a termination of monitoring.

- 24 -

independent analysis of the uncontested evidence submitted by the parties to assess whether the Commonwealth had met its burden to show substantial compliance with the judgment, or whether the plaintiffs had met their burden to show a lack of substantial compliance with the judgment, see Rosie D., 362 F. Supp. 3d at 57-61.

The majority concedes that an inquiry into the Commonwealth's substantial compliance with the judgment "would have been appropriate if the Commonwealth was seeking to modify the judgment." That statement reveals a misunderstanding of the posture of this case: the Commonwealth did seek a modification of the judgment. So did the plaintiffs. Based on its assessment of the parties' evidentiary submissions, the district court determined that the Commonwealth had not met its burden to demonstrate good cause and that the plaintiffs had.

Yet, remarkably, the majority declares that "[n]either th[e] 'good cause' standard nor any examination of it appear anywhere in the district court's analysis." The district court's entire decision is a good-cause analysis. The determination that good cause existed to modify the judgment by extending monitoring was premised on the district court's finding that the Commonwealth did not substantially comply with the judgment and federal law. Put differently, the district court's finding that the Commonwealth failed to employ adequate processes to ensure

compliance with the fourteen-day reasonable promptness standard constituted "good cause" to extend the period for compliance monitoring.

A close examination of the district court's order demonstrates the error in the majority's assertion that the district court never made a good cause finding.  The court repeatedly stated that the undisputed evidence submitted by the parties revealed that the Commonwealth was not in compliance with the reasonable promptness requirement of the judgment and federal law, leading to "grave potential consequences for the health and welfare of [] vulnerable children." Rosie D., 362 F. Supp. 3d at 48.  It called the Commonwealth's failure to provide the ICC service with reasonable promptness a "manifest and easily quantified failure" to comply with the judgment and federal law that "makes denial of Defendants' motion to terminate oversight inevitable."  Id. at 48-49.  The court explained:

> The undisputed facts of record confirm that for a very substantial portion of the Plaintiff children, Defendants have for years failed, and continue to fail, to satisfy [the reasonable promptness] requirement. Depending on the particular month and year, between thirty and sixty percent of the Plaintiff children seeking ICC services continue to wait beyond the fourteen-day period for their first appointment, often for much longer. . . . Recent reports ominously suggest that the fail rate for providing timely ICC services is increasing, not diminishing.  Moreover, and most frustratingly, Defendants in status

- 26 -

conferences over the past eighteen months have offered no concrete plan to rectify this situation and have begun to profess themselves neither able nor obliged to take any specific steps to alleviate this glaring failure in compliance.

Id. at 48.

Later in its analysis, the district court revealed that the Commonwealth's own evidentiary submissions -- not just the plaintiffs' -- demonstrated its failure to provide the ICC service with reasonable promptness. The court explained that "Defendants' own statement of material facts acknowledges that since 2010 over twenty percent of class members have not received initial ICC appointments within the required fourteen days."[14]  Id. at 58-59. In the end, the court concluded:

[N]o dispute exists as to the fundamental fact that, after years of outcry from Plaintiffs and persistent prodding by the court, in any given month Defendants are violating the Medicaid standard -- the standard that they themselves adopted -- for one-third to one-half of the SED children needing services.

---

[14] As noted, the district court's March 2012 order approving the fourteen-day access standard explained that "[t]his means that no more than fourteen days will elapse between the initial contact with the ICC provider and the first offered date for a face-to-face meeting."  The order also stated that it approved the new standard "with the understanding that the contractual obligations of the ICC providers as contained in their performance specifications would require that the period be three days for at least 50% of the clients, ten days for 75% of the clients, and no more than fourteen days for 100% of the clients."

Id. at 60.  Indeed, no factual dispute did exist, nor does one exist now:  neither party requested an evidentiary hearing before the district court, id. at 52, and the Commonwealth does not challenge on appeal the factual basis for the district court's decision.[15]

As the majority acknowledges, federal Medicaid law requires that states provide medical assistance with "reasonable promptness," 42 U.S.C. § 1396a(a)(8), and create "reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan," id. § 1396a(a)(17).  The Department of Health and Human Services' regulations implement these requirements by mandating that a state Medicaid agency

> must set standards for the timely provision of EPSDT services which meet reasonable standards of medical and dental practice, as determined by the agency after consultation with recognized medical and dental organizations involved in child health care, and must employ processes to ensure timely initiation of treatment, if required, generally within an outer limit of 6 months after the request for screening services.

42 C.F.R. § 441.56(e) (emphasis added).

---

[15] At oral argument, counsel for the Commonwealth explained that "we do have a quarrel with which numbers the court decided to frontline, but this is not a factual dispute.  This is a pure legal question as to whether the court . . . could use a term not in the four corners of the judgment as a basis for denying our motion."

- 28 -

Contrary to the majority's insinuation, the district court's order does not suggest, with "little formal analysis," that "[a] requirement to 'employ processes' to meet a goal is [] the same as a requirement that the goal be met in all cases."[16] Rather, quite logically, the district court concluded that the Commonwealth's providers' frequent failure to meet the fourteen-day standard for access to the ICC service was evidence that the processes employed by the Commonwealth were not sufficient to satisfy the regulation. Indeed, the district court's order is laden with examples of not just the Commonwealth's demonstrated failure to provide the ICC service with reasonable promptness, but also its reluctance to undertake any concrete steps to remedy that failure.

For example, the district court explained that the Commonwealth presented no plan to address its staffing problems and "resist[ed] any efforts by the court or by Plaintiffs to identify possible strategies to address the access problem." See Rosie D., 362 F. Supp. 3d at 60. The court concluded that it had "no confidence that we have a plan to deal with the access issue." Id. at 57. That conclusion, based on a "formal analysis" by any

---

[16] The district court's order states no fewer than six times that it found a lack of "substantial compliance" with the judgment. See Rosie D., 362 F. Supp. 3d at 48, 49, 51, 57, 61. The use of the term "substantial compliance" belies the notion that the district court required the Commonwealth to meet the fourteen-day standard in every instance.

- 29 -

measure, clearly reflects the court's considered judgment that the Commonwealth was failing to employ adequate processes "to ensure timely initiation of treatment."  42 C.F.R. § 441.56(e).

In a further misguided critique of the district court's order, the majority declares without elaboration that the district court "failed to apply anything approaching [the] standard [in Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992)] in examining whether it was appropriate to modify the Judgment to extend the monitoring requirements."  But the district court's good-cause analysis aligns with the analysis prescribed by Rufo, even if the court did not explicitly cite to that case.  The majority's insistence on some formalistic invocation of Rufo again elevates form over substance and neglects Rufo's central holding that the inquiry into modification of a judgment should be flexible and compatible with the court's inherent equitable authority.

Rufo involved a consent decree governing the institutional reform of a county jail.  502 U.S. at 371.  The defendant-petitioners sought to modify the decree pursuant to Federal Rule of Civil Procedure 60(b)(5) to allow double-bunking in the jail, in order to increase the capacity of the facility due to an allegedly unanticipated increase in the number of pretrial detainees.  Id. at 376.  At the time, Rule 60(b) read, in relevant part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; . . .

Id. at 378 (quoting Fed. R. Civ. P. 60(b) (1988)).[17]

The Supreme Court concluded that the district court and Court of Appeals had erred by holding that Rule 60(b)(5) codified the "grievous wrong" standard from United States v. Swift & Co., 286 U.S. 106, 119 (1932), which required "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions" for modification of the judgment. See Rufo, 502 U.S. at 380. Instead, the Court interpreted Rule 60(b), in the context of institutional reform litigation, to adopt a more "flexible approach," noting that such flexibility "is often essential to achieving the goals of reform litigation." Id. at 381.

The Court provided some guidance to lower courts on how to conduct that flexible inquiry. It stated that the "party

---

[17] The current version of Rule 60(b) is substantively identical. The analogous portion reads: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; . . ."

seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." Id. at 383. The Court chose not to explicitly define the concept of "a significant change in circumstances." Rather, it described, in an open-ended fashion, some circumstances that might permit modification of a judgment. Accord United States v. W. Elec. Co., 46 F.3d 1198, 1203-04 (D.C. Cir. 1995) ("[T]he Court in Rufo . . . describe[d] circumstances that might warrant revision of consent decrees. We stress the 'might' because the Court, having first pronounced Rule 60(b)(5) 'flexible,' was careful not to reintroduce rigidity."). One of those potential circumstances was "when enforcement of the decree without modification would be detrimental to the public interest." Rufo, 502 U.S. at 384.

In this case, the district court found that unanticipated circumstances required a modification of the judgment in order to serve the public interest. Those circumstances, of course, were the Commonwealth's failure to achieve substantial compliance with the judgment by the deadline originally set forth in the judgment. The district court's order extending monitoring reflected its realization that the judgment's original deadline was "unrealistically optimistic." See Rosie D., 362 F. Supp. 3d at 52. Moreover, the court determined that an extension of monitoring, in order to assess the Commonwealth's

ongoing efforts to achieve compliance with the judgment, served the public interest.  As detailed above, the court determined that the Commonwealth's non-compliance with the reasonable promptness requirement of federal law put vulnerable children at risk for crises that could be "analogously acute [to appendicitis]," requiring emergency intervention to the detriment of those children, their families, and the public health system.  Id. at 51.  Thus, there was good cause to modify the judgment to extend monitoring.  The district court's robust good-cause analysis was consistent with Rufo.

Finally, citing to Rufo, the majority accuses the district court of "interfer[ing] with the policy prerogatives of a state's democratically elected government" by extending the timeframe for monitoring.  But the district court has demonstrated meticulous sensitivity to the sovereignty of the Commonwealth since the start of this case, repeatedly looking to the Commonwealth to generate specific plans and criteria to bring itself into compliance with federal law.  In 2007, after the district court entered its liability decision and asked the parties to submit proposed remedial plans, it adopted -- nearly in its entirety -- the Commonwealth's proposed plan, rather than the plaintiffs'.  See Rosie D. ex rel. John D. v. Romney, 474 F. Supp. 2d 238, 239 (D. Mass. 2007).  Likewise, as detailed infra Section III, consistent with federal law, the court declined to dictate a

timeliness standard for the ICC service.  Rather, it allowed the Commonwealth to adopt its own standard, and later, over the objection of the plaintiffs, permitted it to modify that standard once it determined that the new standard was medically reasonable.

In sum, by allowing the Commonwealth to craft a remedy, develop its own timeliness standard, and modify that standard when its own data indicated compliance was challenging, the district court demonstrated respect for the principles of federalism.  The court's refusal, however, to disregard the Commonwealth's violation of federal law was also consistent with those principles.  See Horne, 557 U.S. at 450 (explaining that, despite the importance of respect for state sovereignty, "[i]t goes without saying that federal courts must vigilantly enforce federal law").

## III.

The majority concludes that the district court should not have used the fourteen-day standard as a metric for assessing "reasonable promptness" because neither federal law nor the judgment expressly states that timeframe.  That conclusion reflects a flawed interpretation of federal law and misconstrues both the nature of the judgment entered in this case and the doctrine limiting enforcement of a judgment to its four corners.

Again, I return to the text of the EPSDT implementing regulation, which says that a state Medicaid agency

- 34 -

> must set standards for the timely provision of EPSDT services which meet reasonable standards of medical and dental practice, as determined by the agency after consultation with recognized medical and dental organizations involved in child health care, and must employ processes to ensure timely initiation of treatment, if required, generally within an outer limit of 6 months after the request for screening services.

42 C.F.R. § 441.56(e). The regulation explicitly requires states to consult with medical professionals to develop standards for the timely provision of care. It defies logic that those carefully crafted, medically supported standards are unenforceable once adopted by a state, and that only the backstop timeframe of six months may be used as a metric to assess reasonable promptness.

As quoted above, federal law gives states, not federal courts, the initial responsibility of developing a timeliness standard. See id. In the event of a litigated dispute about this timeliness requirement, the court has two roles. First, it must ensure that the standard that a state adopts is "reasonable" based on evidentiary submissions by the state. This is the process the court undertook in 2012 when the Commonwealth sought to change the ICC access standard from three days to fourteen days, over the plaintiffs' initial objection. Second, after the court determines that a state's timeliness standard meets "reasonable standards of medical and dental practice" and enters an order to that effect, the court has continuing authority to ensure that the state's

providers meet the timeliness standard.  See id.  That continuing authority was specified in the court's 2007 judgment which set forth a monitoring procedure and timeframe.  In the exercise of that authority, the court rejected the Commonwealth's request to end monitoring in 2018, based on the Commonwealth's undisputed failure to employ adequate processes to implement the fourteen-day requirement.

That the judgment implemented these elements of federal law, and the Commonwealth understood it to do so, is beyond dispute.  The judgment explicitly stated that its purpose was to remedy the federal law violations found in its liability opinion, including the Medicaid Act's "reasonable promptness" provision, 42 U.S.C. § 1396a(a)(8).  It also expressly required the Commonwealth to both "establish standards for [providers] that will include . . . service delivery standards" and "amend its managed care behavioral health contract to require the behavioral health contractor to procure a network of [providers] that meet the standards established by [the Commonwealth]," echoing the commands of federal law.

The Commonwealth itself described this scheme in multiple submissions to the court urging the court's approval of the fourteen-day access standard back in 2012.  In a letter addressed to the court, the Commonwealth explained:

EOHHS[18] wishes to make clear its understanding of the mechanics by which a state Medicaid agency sets timeliness standards for EPSDT services. The controlling regulation, 42 C.F.R. § 441.56(e), mandates that a state agency "set standards for the timely provision of EPSDT services which meet reasonable standards of medical and dental practice . . . ." The regulation goes on to state that such standards shall be "determined by the agency after consultation with recognized medical and dental organizations involved in child health care . . . ." The Judgment in this case implicitly adopts that requirement, insofar as it directs the defendants to "establish standards for CSAs" that "will include," among other things, "service delivery standards." Judgment at ¶ 38(b).

The Commonwealth also submitted to the court a copy of a memorandum that it had sent to the president of the New England Council of Child and Adolescent Psychiatry ("NECCAP"), seeking guidance from NECCAP on an appropriate reasonable promptness standard for the ICC service. The memorandum began:

> Federal law requires a state to set standards for the timely provision of EPSDT services, which must meet reasonable standards of medical practice. To that end, we are consulting with medical professionals familiar with high fidelity Wrap-around to determine what time standard is medically reasonable. We seek your guidance as to an appropriate outside limit beyond which no member eligible for ICC should wait to obtain ICC -- a time period that you would consider to be reasonably prompt.

---

[18] "EOHHS" stands for "Executive Office of Health and Human Services," the Massachusetts agency in charge of administering the Commonwealth's Medicaid program.

These submissions unambiguously reflect the Commonwealth's understanding that federal law and the judgment entered by the district court grant the Commonwealth the initial opportunity to develop a standard for reasonably prompt access to the ICC service, which is then subject to the court's approval and subsequent monitoring to ensure compliance with that standard -- the so-called "outside limit."  Thus, the fact that the judgment itself does not explicitly dictate a timeliness standard is beside the point.  Given that the judgment incorporates the federal mandate to ensure compliance with the standard adopted by the Commonwealth, the fourteen-day obligation necessarily became part of the judgment when it was approved by the court as medically reasonable under federal law.

Moreover, to the extent that there was ever any doubt that the court would affirmatively monitor compliance with the Commonwealth's own fourteen-day reasonable promptness standard, the March 2012 order put that doubt to rest.  After stating the court's approval of the fourteen-day standard, the order dictated that:

> The court will be monitoring data regarding access carefully to [e]nsure that the approval of the more generous standard does not result in longer delays.  Defendants will copy the court, Plaintiffs, and the court monitor with the monthly data reports on this issue.

The Commonwealth never appealed that order; for the past eight years, the fourteen-day standard has governed the Commonwealth's conduct.

The need to limit enforcement of a judgment to its text is grounded in principles of fair notice and preventing plaintiffs from "short-circuit[ing] the usual adjudicative processes." Harvey v. Johanns, 494 F.3d 237, 245 (1st Cir. 2007). For the reasons described above, there is no question that the Commonwealth has been on notice of the enforceability of the fourteen-day standard since it was adopted. The fourteen-day standard was extensively discussed between the parties and the court in post-judgment proceedings and adopted over the initial objection of the plaintiffs. Consistent with the language in the 2007 judgment incorporating the "reasonable promptness" requirement of the Medicaid Act, the court's March 2012 order reiterated that the fourteen-day reasonable promptness standard for ICC was more than aspirational -- it was an obligation enforceable against the Commonwealth. Thus, the majority's assertion that the judgment did not give the Commonwealth fair notice that it was required to take adequate steps to ensure that its providers comply with the fourteen-day access standard is implausible.

**IV.**

The majority calls its opinion "narrow" and minimal in its impact because the plaintiffs remain "free to pursue claims of

- 39 -

violation of the express terms of the Judgment, including that the Commonwealth is in violation of the Judgment because a fourteen-day standard is required by federal law." The majority's decision is not remotely narrow or minimal in its impact. Most fundamentally, given the undisputed findings of the district court, its decision will delay even further delivery of essential services to vulnerable children with SED in the Commonwealth. Inevitably, given this reality, the plaintiffs will follow the majority's instruction and seek to establish a violation of the fourteen-day standard by largely duplicating the case that they have already made to the district court in support of their request to extend monitoring. The Commonwealth will undoubtedly respond with much of the same evidence that it has already submitted to the district court in support of its substantial compliance motion. Hence, the proceedings envisioned by the majority will largely duplicate the proceedings that have already taken place before the district court, wasting everyone's time, energy, and resources.

The majority's decision may also have a disruptive effect on the Commonwealth. The Court Monitor's appointment, which requires state funding and significant advance coordination, will lapse. If the court later determines, for the exact same reasons detailed in its order at issue here, that monitoring must continue, the Commonwealth will have to reallocate the funds and reorganize its staff to meet that obligation.

Moreover, the majority's unwarranted criticism of the district court belies the court's laudable effort to foster a collaborative spirit between the parties for nearly fifteen years, often acting as a mediator in the status conferences it held with them every three to six months.  See Rosie D., 362 F. Supp. 3d at 53 n.10.  These efforts have been productive: "[d]ue to the hard work of [the Commonwealth], the Plaintiffs, and the Court Monitor, a system of care for Medicaid-eligible SED children has emerged in the Commonwealth that bears little resemblance to the random, meager programming available when this lawsuit was filed."  Id. at 52.  Vulnerable children with SED throughout the Commonwealth have benefited from the district court's sound judgment and ability to facilitate voluntary compliance from all parties.

Still, despite that progress, there remains the Commonwealth's critical failure related to the ICC service.  Hence, the district court properly found that the judgment and federal law require the Commonwealth to take adequate steps to ensure reasonably prompt access to the ICC service as measured by the fourteen-day standard.  As I have explained, the district court committed no legal error in making that determination.  Instead, there are only the unchallenged factual findings of the district court and the exercise of its discretion, based on those factual findings, in concluding that there was good cause to decline to end monitoring early and to modify the judgment to extend

monitoring.  See Fortin v. Comm'r of Mass. Dep't of Pub. Welfare, 692 F.2d 790, 798 (1st Cir. 1982) (holding that a district court's decision to modify a judgment is "reviewable only for abuse of discretion").

That exercise of discretion should not be disturbed.  We owe special deference to the district court's nearly twenty years of experience with this case.  See, e.g., Rufo, 502 U.S. at 394 (O'Connor, J., concurring in the judgment) ("Our deference to the District Court's exercise of its discretion is heightened where, as in this litigation, the District Court has effectively been overseeing a large public institution over a long period of time"); Hutto v. Finney, 437 U.S. 678, 688 (1978) (holding that, in the context of institutional reform litigation, the district court's "exercise of discretion . . . is entitled to special deference because of the trial judge's years of experience with the problem at hand").  The majority's opinion reflects an unjustified refusal to respect, understand, and defer to the district court's discretion in this matter, with profound consequences for thousands of needy children in the Commonwealth.

I respectfully dissent.